# United States Court of Appeals
## For the First Circuit

No. 04-2545

PETRO DHIMA,

Petitioner,

v.

ALBERTO GONZALES,
Attorney General of the United States,

Respondent.

---

ON PETITION FOR REVIEW OF AN ORDER
OF THE BOARD OF IMMIGRATION APPEALS

---

Before

Boudin, Chief Judge,
Lynch and Howard, Circuit Judges.

---

Saher J. Macarius and Law Offices of Saher J. Macarius on brief for petitioner.

Joan Hogan, Attorney, Department of Justice, Peter D. Keisler, Assistant Attorney General, Civil Division, and Papu Sandhu, Senior Litigation Counsel, Office of Immigration Litigation, on brief for respondent.

---

July 28, 2005

---

**LYNCH**, **Circuit Judge**.    The petitioner, Petro Dhima, a native and citizen of Albania, seeks review of the denial of his application for asylum.    The Immigration Judge (IJ) found that Dhima was not credible, and that he failed to establish past persecution or a well-founded fear of future persecution, so that he was ineligible for asylum.    The Board of Immigration Appeals (BIA) summarily affirmed the IJ's decision.    We affirm the BIA and deny the petition for review.[1]

## I.

Dhima entered the United States on November 16, 2001 without proper entry documents.    Immigration officials took him into custody.    In his interview with an officer of the (then) Immigration and Naturalization Service (INS),[2] he claimed to be a member of no political organization but that he sympathized with the Democratic Party (the opposition party to the Socialist government) in Albania.    He also said that he was involved at a May 27, 2001 demonstration during which "a group of police started to kick us."    The police were "trying to bring us to the police station but we escaped."

---

[1]  Alberto Gonzales was sworn in as Attorney General of the United States on February 3, 2005.    We have substituted him for John Ashcroft, previous holder of that office, as the respondent.    See Fed. R. App. P. 43(c)(2).

[2]   The functions of the INS were subsequently subsumed in the Department of Homeland Security.

-2-

On November 26, 2001, the INS served Dhima with a Notice to Appear, charging him with being removable pursuant to 8 U.S.C. § 1182(a)(7)(A)(i)(I). Dhima admitted removability and applied for asylum, withholding of removal, protection under the Convention Against Torture (CAT), and voluntary departure, on the basis of alleged persecution for his political opinions and activities.

In his asylum application, contrary to what he told the interviewing INS officer, Dhima claimed to be a longstanding member of the Democratic Party, and gave a different account of his involvement in the demonstration of May 27, 2001. This time, he stated that he suffered "severe injuries" to his head and went into a "coma" when the police attempted to arrest him. The crowd, he stated, prevented the arrest, and he woke from his coma in a hospital.

In his sworn affidavit accompanying the application, Dhima gave roughly the same account of the events of May 27, 2001, but added a new and also contrary fact: "I, along with many of my friends, were arrested following that event."

At his merits hearing before an IJ on July 8, 2003, Dhima testified that he became a member of the Albanian Democratic Party in December 1990. Dhima gave yet another inconsistent account of the events of May 27, 2001. This time, he stated that he was beaten by "people of the security" who "didn't look like the police." He was not arrested or dragged to a car. But he received

-3-

a head wound, became unconscious, and woke up in a hospital. In this version, Dhima also explained that he left the hospital after one hour.

Dhima testified that about five months later, on September 24, 2001, he received a notice slipped under his door for him to report to the police station on that same day. Dhima explained that he was afraid for his life and two of his friends who participated in the May demonstration had been arrested and tortured. He did not go to the police station, but instead escaped to his father's village. He said that the police came to his parents' house and asked them where he was, but his father told the police nothing. Dhima then left Albania for Greece with a false passport, and ultimately came to the United States by way of France and Mexico.

Dhima also testified that during his participation in another demonstration in 1997, "[t]he people of the security" "assaulted me and especially in me legs, both of them." He explained that as a result of being beaten with a stick, he received wounds in his nose, elbow, arms, and legs. This 1997 demonstration and the associated beating were not mentioned in the interview, the asylum application, or the supporting documentation he submitted to the IJ.

Dhima testified that after the May 2001 demonstration, at which he was purportedly injured, he went to the U.S. Embassy in

Greece in July 2001. He told the Embassy officers only that he wanted to obtain a visa for the United States for a vacation. He did not discuss asylum. Having failed to obtain a visa, he voluntarily returned to Albania.

Another witness, Frank Camaj, president of the Albanian-American International Institute, a "bicultural education institution . . . that facilitates . . . the causes of . . . Albanian-Americans," testified on behalf of Dhima. Camaj testified that Dhima's family has one of the "thickest files" in Albania and has been "marked for persecution" by the authorities. Camaj also explained that the current Albanian government is run by the "same people" as the previous Communist regime and that the current government "commit[s] far worse atrocities" than before.

Dhima also submitted a certificate allegedly from the Chairman of the Democratic Party of Albania, which described Dhima as a "supporter" of the party and stated that Dhima was "maltreated physically" on May 27, 2001, and also on another occasion in June of that year. Dhima himself never mentioned a June incident. As well, Dhima submitted the notice that he supposedly received ordering him to report to the police on September 24, 2001, and a document from an Albanian hospital stating that he was treated on May 27, 2001 for "contusion of the head and body" and "fracture of rib."

The IJ denied Dhima's application in an oral decision on July 8, 2003. The IJ determined that Dhima had failed to show a well-founded fear of persecution, and also failed to show that it is more likely than not that he would be persecuted or tortured if returned to Albania. The IJ found Dhima not credible, pointing to Dhima's failure to "provide a cogent and consistent account of the events surrounding" the May 27, 2001 demonstration, which went "to the very heart of [Dhima's] claim." The IJ also explained other factors which contributed to his finding that Dhima was not credible: 1) Dhima was inconsistent in what he said concerning his membership in the Democratic Party; 2) Dhima did not report the 1997 demonstration at which he was supposedly badly beaten in any of his written submissions; 3) the circumstances surrounding the police summons and the inability of the police to locate him in his father's village were inexplicable given Camaj's assertion that Dhima's family is a prominent dissident family closely tracked by the government; 4) Dhima had tried to come to the United States by applying for a visitor's visa without mentioning any persecution, indicating that he had formed an intent to come to the United States even before the notice to report to the police, which he claimed was the triggering event; and 5) Camaj's and Dhima's testimony of the repressiveness of the Albanian government is at odds with the U.S. State Department Profile of Asylum Claims and Country Conditions, released in May 2001, which described the 1997

elections as "adequately reflect[ing] the will of the people" and stated that "[b]oth major political parties trace their roots to the communist regime and repudiate it throughly."

The IJ also found the documentation submitted by Dhima to be insufficient to salvage his credibility. The IJ questioned the certificate that purportedly came from the chairman of the Democratic Party because the certificate consisted of "unsubstantiated rhetoric, unsupported by any evidence of how the maker came into possession of the facts set forth." As for the hospital document, the IJ noted that the U.S. State Department Profile explained that "documents issued by Albanian medical practitioners are rarely reliable." The IJ also found Camaj's testimony to be more "passionate" than reliable.

Dhima appealed to the BIA, which summarily affirmed the IJ pursuant to 8 C.F.R. § 1003.1(e)(4), making the IJ's decision the final agency decision for purposes of appellate review. See Albathani v. INS, 318 F.3d 365, 373 (1st Cir. 2003). Dhima then petitioned this court for review solely as to the IJ's denial of Dhima's asylum claim.[3] Dhima argues that the IJ's adverse credibility determination is not supported by substantial evidence.

_____

[3] Dhima's petition comes to us after the passage of the REAL ID Act of 2005, Pub. L. 109-13, 119 Stat. 302, which alters, among other things, the standards governing credibility determinations and the need for corroboration of testimony in asylum cases. The new provisions of the Act are not applicable to this case since Dhima's application for asylum was filed prior to the effective date of the amendments.

He also argues that the BIA erred by summarily affirming the IJ's decision.

## II.

Denial of Asylum

We review factual findings and credibility determinations of the IJ under the deferential substantial evidence standard. INS v. Elias-Zacarias, 502 U.S. 478, 481 (1992); Akinwande v. Ashcroft, 380 F.3d 517, 522 (1st Cir. 2004). The IJ's determination must stand "unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B); see Rodriguez-Ramirez v. Ashcroft, 398 F.3d 120, 123 (1st Cir. 2005). As to issues of credibility, we will give great deference to an IJ's determinations so long as the IJ provides "specific reasons for those determinations." Akinwande, 380 F.3d at 522; see Syed v. Ashcroft, 389 F.3d 248, 251-52 (1st Cir. 2004).

The petitioner for asylum has the burden of proof for establishing eligibility for asylum. Diab v. Ashcroft, 397 F.3d 35, 39 (1st Cir. 2005); 8 C.F.R. § 1208.13(a). Applicants can meet this burden by proving either past persecution or a well-founded fear of future persecution on account of "race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C § 1101(a)(42)(A); 8 C.F.R. § 1208.13(b). An applicant's testimony, "if credible, may be sufficient to sustain the burden of proof without corroboration," 8 C.F.R. § 1208.13(a),

but if the applicant is found not to be entirely credible, corroborating evidence "may be used to bolster an applicant's credibility." Diab, 397 F.3d at 39. Dhima's argument that he is eligible for asylum requires, as a threshold matter, that the IJ's credibility finding be unsupported by the record.

The IJ's determination that Dhima was not credible is unassailable. The IJ identified numerous inconsistencies and omissions in Dhima's testimony and application for asylum, and offered specific reasons for his adverse credibility determination, each of which is amply supported by the record.

Dhima offers no arguments to address most of these reasons; he addresses only the IJ's determination that there were crucial discrepancies concerning his multiple accounts of the May 27, 2001 incident.[4] Dhima argues to us that the multiple versions are not necessarily inconsistent if one resolves all apparent contradictions and ambiguities in the various accounts in favor of Dhima. But there is no requirement that the IJ favor the petitioner in this way. Dhima provides no coherent explanation for why, in his accounts of the May 27, 2001 incident, he sometimes claimed to have been arrested and sometimes to have escaped arrest, or why the details of his maltreatment kept on changing. The

---

[4] Even if Dhima were right that the IJ erred in his finding on this one factor, the combination of the other factors cited by the IJ would still lead us to conclude that the IJ's adverse credibility finding is supported by substantial evidence. But Dhima does not even get that far.

-9-

record does not suggest, much less compel, a conclusion that the multiple accounts were cogent and coherent.

Dhima next argues that the IJ improperly disregarded the additional corroborating documentary evidence and testimony from Camaj. In actuality, the IJ evaluated the documents and determined that they were insufficient to compensate for Dhima's lack of credibility; indeed, they were suspect in themselves. The IJ's conclusions are amply supported. Dhima offers no explanation for how the Chairman of the Democratic Party of Albania, who purportedly authored the certificate he submitted, would have knowledge of the specific facts concerning Dhima (indeed, the certificate talks of Dhima being maltreated in June of 2001, which Dhima does not say happened). As for the hospital record, it was dated August 17, 2002 (obtained after the start of his asylum proceedings), and thus was not made contemporaneous with his visit. The hospital document also described Dhima as having suffered a broken rib, which Dhima does not mention in his testimony. The IJ noted the State Department's conclusion that "[d]ocuments issued by Albanian medical practitioners are rarely reliable."

As for Camaj's testimony, Camaj did not have personal knowledge of the events described by Dhima, and his assessment of Albania's country conditions and the prominence of Dhima's family

-10-

as dissidents were at odds with the State Department Profile and Dhima's own account of his success at eluding capture.[5]

BIA's Summary Affirmance

Dhima's argument attacking the BIA's summary affirmance because it does not state the BIA's own reasons is foreclosed by our decision in Albathani v. INS, 318 F.3d 365, 377-78 (1st Cir. 2003). There, we rejected a similar challenge to the BIA's summary affirmance procedure: although the summary affirmance does not give the BIA's reasons, "[t]he courts will continue to have the IJ's decision and the record upon which it is based available for review." Id. at 378.

Dhima's argument that his case falls outside the bounds of 8 C.F.R. § 1003.1(e)(4) is also without merit. Dhima appears to argue, in cursory fashion, that existing precedent does not "squarely" control his case, which involves a "novel" fact situation. See 8 C.F.R. § 1003.1(e)(4)(i)(A). However, Dhima does not explain (and we think he cannot) what makes the IJ's routine credibility finding in this case "novel" or in what way the IJ's decision extended existing precedent.

---

[5] Finally, Dhima selectively quotes from the U.S. State Department Country Conditions Report for Albania to suggest that the Report closely corroborates Dhima's claims. It does not. For example, Dhima quotes the Report as saying, "[T]he Democratic Party alleged that the Government was responsible for the killing of one of its members in police custody. . . ." The elided portion of the original quote was "although a government medical team confirmed that the death was a suicide."

-11-

**III.**

The BIA's order is **<u>affirmed</u>** and the petition for review **<u>denied</u>**.