# United States Court of Appeals
## For the First Circuit

No. 04-2623

XUE XIANG CHEN,

Petitioner,

v.

ALBERTO GONZALES,
Attorney General of the United States; et al.

Respondents.

ON PETITION FOR REVIEW OF AN ORDER
OF THE BOARD OF IMMIGRATION APPEALS

Before
Selya, Lynch, and Lipez, <u>Circuit Judges</u>.

<u>Douglas B. Payne</u> on brief for petitioner.
<u>George B. Henderson, II</u>, Assistant United States Attorney, and
<u>Michael J. Sullivan</u>, United States Attorney, on brief for
respondents.

August 12, 2005

**LYNCH**, **Circuit Judge**.  The petitioner, Xue Xiang Chen, from the People's Republic of China, unlawfully entered the United States on June 17, 2001, and applied for asylum, withholding of removal, and protection under the Convention Against Torture (CAT).  The application was based on Chen's allegations that the government forced his girlfriend to have an abortion in China in 1998.

The Immigration Judge (IJ) found him not credible and denied him the requested relief.  The Board of Immigration Appeals (BIA) adopted and affirmed the IJ's decision.  It also added an additional, independent ground for denial.  The BIA reasoned that even assuming Chen was credible, he was not married to his girlfriend, and thus was not eligible for this type of refugee status: the BIA has interpreted the scope of the relevant statutory provision, Section 601 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), which amended 8 U.S.C. § 1101(a)(42)(B), to limit eligibility for asylum to persons forced to undergo abortions or sterilization procedures themselves and to their spouses.[1]  See Ma v. Ashcroft, 361 F.3d 553, 554 (9th Cir. 2004); In re C-Y-Z-, 21 I. & N. Dec. 915 (BIA 1997).  Chen argues that it is irrational for the BIA to permit spouses to apply

---

[1]  IIRIRA added to the definition of "refugee" the following: "a person who has been forced to abort a pregnancy or to undergo involuntary sterilization, or who has been persecuted for failure or refusal to undergo such a procedure or for other resistance to a coercive population control program."  8 U.S.C. § 1101(a)(42)(B).

for asylum, but not boyfriends or girlfriends.  There is an active circuit split on this question of law.[2]

We acknowledge but do not weigh in on the question.  That is because we affirm on the ground of the adverse credibility finding,[3] which was also adopted and affirmed by the BIA, and for which there is ample evidence.[4]

---

[2]  For example, compare Ma v. Ashcroft, 361 F.3d 553, 561 (9th Cir. 2004) (holding 8 U.S.C. § 1101(a)(42)(B) applicable to "husbands whose marriages would be legally recognized, but for China's coercive family planning policies, and not only to husbands whose marriages are recognized by Chinese authorities") with Chen v. Ashcroft, 381 F.3d 221, 226-27, 229 (3d Cir. 2004) (giving Chevron deference to the BIA's "decision not to extend C-Y-Z- to unmarried partners" but dubious about the BIA's reasoning extending statutory protection to spouse who was not forced to undergo abortion or sterilization).  See also Yuan v. U.S. Dep't of Justice, No. 02-4632-AG, 2005 WL 1745200, at *4 (2d Cir. July 26, 2005) (expressing doubt as to BIA's reasoning in C-Y-Z-).  The Second Circuit has recently remanded three cases raising the issue of the eligibility of boyfriends and fiancés under 8 U.S.C. § 1101(a)(42)(B) to the BIA so that the BIA can "more precisely explain its rationale" behind its construction and define if and when non-married partners may be eligible for asylum.  Lin v. U.S. Dep't of Justice, No. 02-4611, 2005 WL 1791996, at *5 (2d Cir. July 29, 2005).

[3]  Chen's petition for review is solely focused on his claim for asylum, challenging the credibility finding and the BIA's interpretation of 8 U.S.C. § 1101(a)(42)(B).  He has offered no arguments with respect to his claims for withholding of removal or protection under the CAT.  He has therefore waived any challenge to the BIA's denial of these claims.  See Ali v. Gonzales, 401 F.3d 11, 14 n.3 (1st Cir. 2005).

[4]  Alberto Gonzales was sworn in as Attorney General of the United States on February 3, 2005.  We have substituted him for John Ashcroft, previous holder of that office, as the lead respondent.  See Fed. R. App. P. 43(c)(2).

**I.**

In his application for asylum, Chen recounted the following story. Chen lived with his parents in their house in Tantou Town, which is in Changle City in Fujian Province. On July 7, 1997, three public health officials saw Yung Liu, Chen's girlfriend, and wanted "to detain her for a pregnancy checkup." As the officials struggled with Liu, Chen attempted to intervene, and the officials "used a[n] electro-shock apparatus and momentarily stunned [him], rendering [him] immobil[iz]ed." When Chen revived, he fled the scene, and one of the officials, who chased after Chen, "slipped and fell, injuring himself in the process." Liu's pregnancy test turned up negative.

On July 25, 1997, the same public health officials brought policemen to Chen's house to question him. Chen was not home. Chen's father "panicked trying to open the door for the police" and "fell down the stairs and injured his head, causing severe injuries." He died ten days later in the hospital from the injury.

> Chen wrote:
>
> After my father was injured, I went to the hospital to see him until he died. I borrowed money from friends and buried my father. Then I went to the police station trying to find answers as to why my father was injured and why no one helped him. At the police station, . . . the police beat me. They then took me to the hospital. I stayed in the hospital for two days.

After he left the hospital, Chen attempted to sue the government. When no attorney would take his case, he became frustrated and "took a large rock and threw it at a government building and broke the plate glass."

On April 1, 1998, the police went to Chen's house to arrest him for breaking the window. While Chen was not there, they found Liu. The public health officials again took Liu to be examined. She was three months pregnant this time, and the hospital performed an unwanted abortion on her.

Chen wrote that he stayed in Changle City, hiding with friends until April of 1999. He then went to Yunnan Province, where he met a "snakehead" -- a smuggler who helped him enter the United States.

Chen received a merits hearing before an IJ on September 11, 2003. His testimony before the IJ was inconsistent in numerous ways with his written application. We recount the highlights.

Chen testified that during the July 7, 1997 incident, while the family planning officials were struggling with his girlfriend, he tried to intervene and was beaten for 10 minutes. There was no mention of an "electro-shock" device as set out in his written application. In this version, after the family planning official tripped and fell as he pursued Chen, Chen escaped to his aunt's house in Changle City and stayed there for three to four

months.  Chen had not mentioned fleeing to his aunt's house in his written application.

Chen's testimony was also different from his written application regarding the circumstances of his father's death. Contrary to his written application, Chen testified that he did not have a chance to see his father while his father was in the hospital.  Also contrary to his application, Chen testified that because he was still in hiding, his family and neighbors, but not he, buried his father.

There were inconsistent explanations about his visit to the police at Town Hall.  Chen testified that he went to speak with the police at Town Hall on October 5, 1997.  Unlike his written application, which clearly stated that he went seeking answers for his father's death, Chen's testimony was unclear as to what was his purpose in going to Town Hall.  After much questioning, he indicated that he wanted to negotiate with city officials to help pay for his father's burial and explained that he thought he would "tell them that my father already died so you just don't bother, don't bother with me."

Chen was also inconsistent about what happened to him at Town Hall and afterwards.  In his written application, he wrote that he was brought to the hospital after the police beat him, and that after he was released, he hid with friends.  In his oral testimony, however, Chen made no mention of a hospital.  Instead,

he said that other villagers came to Town Hall and negotiated with the police for his release. Chen also testified that after he left Town Hall, he hid, not with friends, but first in his aunt's house and then in his uncle's house.

Chen testified that he did not know what happened to his girlfriend after he left home or where she was. He said that he was in contact with his mother, and she had not heard from his girlfriend.

Along with his application, Chen submitted documents purporting to be 1) a "certificate of arrest" for Chen issued on March 31, 1998 for "[i]nterference with public affairs"; 2) a certificate that Liu had an abortion on April 1, 1998; and 3) his father's death certificate. During the hearing, the government objected to the documents on the ground that they were not properly authenticated and did not comply with the requirements of 8 C.F.R. § 287.6. The IJ accepted the documents de bene. The IJ attempted to ascertain how Chen obtained the documents. Chen was unclear whether he obtained all of the documents when he was in the United States or when he was in hiding in China, but it was clear that he did not obtain the documents contemporaneously with the events of his narrative.

## II.

Because the BIA adopted the IJ's credibility determination and decision, we review the IJ's decision as the

adopted final agency determination.[5]  Albathani v. INS, 318 F.3d 365, 373 (1st Cir. 2003).

We do not recite the full panoply of burdens and standards for denial of asylum.  Suffice it to say that many asylum claims, as this one, depend on whether the statements made by an alien in support of the asylum application are accepted as credible.  See, e.g., Dhima v. Gonzales, No. 04-2545, 2005 WL 1774549, at *3 (1st Cir. Jul 28, 2005).  Where the agency's final decision rests on the ground that the alien was not credible, then, we see whether the determination of non-credibility is conclusive of his claim.  See id.  If the adverse credibility determination is supported by substantial evidence -- that is, if we cannot say a finding that the alien is credible is compelled -- then the decision must be affirmed.  See 8 U.S.C. § 1252(b)(4)(B); Rodriguez-Ramirez v. Ashcroft, 398 F.3d 120, 123 (1st Cir. 2005).  There may be times when, in performing our judicial review function, we are impaired because the agency does not explain the adverse credibility finding.  That situation does not arise when the IJ gives specific reasons for the determination, which are in turn supported by the evidence.  See Akinwande v. Ashcroft, 380 F.3d 517, 522 (1st Cir. 2004).

---

[5]  Chen argues that the BIA, though it explicitly stated that it adopted the IJ's decision, in fact "distance[d] itself from [the IJ's credibility] finding."  This argument simply misreads the BIA opinion, which clearly adopted the IJ's findings and went on to provide an additional, independent ground for affirmance.

The IJ's adverse credibility determination here is amply supported by stated reasons and the record. A quick glance through the facts recited above reveals numerous inconsistencies, gaps, and contradictions. The IJ gave reasons for her adverse credibility finding: 1) in his account of the first encounter with family planning officials, Chen was inconsistent about whether he was shocked with an electro-shock device and could not explain the inconsistency satisfactorily; 2) he was inconsistent about whether he saw his father during the time when his father was supposedly in the hospital due to the head injury; 3) he was inconsistent about whether he was present at his father's burial, and could offer no convincing explanation for the inconsistency; 4) he could not adequately explain why he went to the Town Hall to see the police when he was still hiding from the police; 5) the general outlines and the details of Chen's story were inconsistent with the U.S. State Department's Profile of Asylum Claims and Country Conditions for China, and specifically the conditions in Fujian Province, but were consistent with the stories that snakeheads suggest to those they smuggle; and 6) Chen's story was lacking in crucial detail and supporting evidence such that the IJ could not find that Chen's girlfriend even exists, let alone that the events recounted by Chen happened. Each of these separate findings contributing to the overall adverse credibility finding is well-supported by the evidence.

Chen makes two arguments in reply: 1) that the IJ misused the State Department's Profile of Asylum Claims and 2) that there are innocent explanations for the inconsistencies. The IJ, argues Chen, used the Profile of Asylum Claims to treat "Chen as [a] member of a class of suspect people, people from Fujian Province in China. That is not permissible." This is a gross mis-characterization of the IJ's decision. The IJ made it clear in her decision: "I will adjudicate this case on its merits but I do note that there are, . . . certain patterns . . . in [the Profile of Asylum Claims]." The IJ is certainly permitted, even encouraged, to consider the Profile of Asylum Claims as background material to an individual claimant's case. See Hernandez-Barrera v. Ashcroft, 373 F.3d 9, 24 (1st Cir. 2004). There was nothing inappropriate.

The second argument is a non-starter. That the IJ might have accepted Chen's explanations of his inconsistencies is not to say she was required to do so. Nothing compels a contrary conclusion.

The petition for review is **denied**.

-10-