# United States Court of Appeals
## For the First Circuit

No. 05-2118

ERIND SIMO,

Petitioner,

v.

ALBERTO GONZALES, Attorney General,

Respondent.

PETITION FOR REVIEW OF AN ORDER

OF THE BOARD OF IMMIGRATION APPEALS

Before

Torruella, Circuit Judge,
Stahl, Senior Circuit Judge,
and Howard, Circuit Judge.

Charles Christophe on brief for petitioner.
H.S. García, United States Attorney, Nelson Pérez-Sosa, Assistant United States Attorney, Senior Appellate Attorney in Charge, and Jaqueline D. Novas, Assistant United States Attorney, on brief for respondent.

April 11, 2006

**STAHL**, <u>Senior Circuit Judge</u>. In May of 2001, Erind Simo, a native and citizen of Albania, arrived in the United States on a falsified passport. At the time of his arrival he was twenty years old. What was then the Immigration and Naturalization Service (INS) detained Simo as he entered the country, and the Department of Homeland Security, successor agency to the INS, now seeks to remove him to his native Albania. After a hearing before an Immigration Judge (IJ), Simo's application for asylum, withholding of removal, and relief under the Convention Against Torture (CAT) was denied, and that decision was affirmed on appeal to the Board of Immigration Appeals. Simo here contends that the Board wrongfully based its decision denying relief on inconsistencies between his testimony at his removal hearing and earlier statements he made to immigration officials at the border. Simo seeks reversal of the Board's affirmance of the IJ's decision, and remand for a new hearing on his various claims for relief. Finding no error in the decision of the Board, we affirm the Board's order and deny the petition for review.

At his hearing before the IJ, Simo recounted a tale of politically motivated harassment. He testified that his father was an activist in the Albanian Democratic Party (DP), which was one of the parties that emerged on the Albanian political scene after the collapse of that country's Communist regime. Simo claimed to have followed in his father's footsteps, joining the party's Youth Forum

in 2000. The Albanian national government was controlled by the country's Socialist Party from 1997 until 2005, when the DP prevailed in the national elections. Throughout the period during which Simo was purportedly a member of the party's youth wing, the DP was a minority faction. Simo alleged that, because of his DP-related activities, he was harassed on four separate occasions by secret and regular police officials. Sometime during the month of October 2000, Simo claimed to have been visited at the local DP party headquarters by a member of the Albanian secret police (SHIK), who confronted him about his party-related activities. In March 2001, the same SHIK officer, accompanied by unidentified thugs, allegedly accosted him on the street and beat him severely. After four days in the hospital, Simo returned home, whereupon local police officers allegedly detained him and interrogated him for two hours about his political activities. Finally, in May 2001, Simo claimed that the same secret police agent and some aides ushered him into a car, drove him around town while holding a gun to his head, and finally threatened to kill him and told him to leave town. Simo testified that immediately following this last incident his father decided that it was no longer safe for him to stay in the country. Simo was not entitled to a passport because he had not performed the mandatory military service that was a prerequisite for a passport's issuance. He claimed that his father

purchased a falsified passport on the black market and sent Simo to the United States to join an aunt and uncle who live in Boston.

Simo was detained on arrival at Boston's Logan Airport and interviewed by an immigration officer. He was asked why he had come to the United States, and said only that he "wanted to leave Albania." He also said that he had purchased his passport for $11,000 from "a guy in the market."[1] The INS began removal proceedings against Simo soon afterward. Simo conceded removability but requested asylum, withholding of removal, and relief under the CAT. At his hearing, Simo related the above events, and provided certain ostensibly corroborating materials. The corroborating evidence included medical records that attested to the fact that Simo had sustained certain injuries in March 2001 after being beaten (though these attestations were produced, not contemporaneously with the purported attack, but later and at the behest of Simo's father, and were post-dated accordingly). Simo also produced a newspaper article from a local Albanian newspaper that described his plight in considerable detail. In response, the government presented a State Department country assessment stating

---

[1]The relevant portion of the colloquy ran as follows:
Q. Where did you get the passport and visa?
A. I bought it.
Q. How much did you pay for the documents?
A. $11,000.
Q. Where did you purchase these documents?
A. In Tirane.
Q. Who did you purchase these documents from?
A. I bought it from a guy in the market.

that it was possible for Albanian asylum-seekers to pay a fee to a local newspaper of ill repute in exchange for publication of a fictional story corroborating an account of political persecution.[2]

---

[2]The newspaper article, as translated and accepted into evidence, with obvious typographical errors corrected, read in its entirety as follows:

The prosecution against the democrat young people goes on. The restitution of the ex-communists in power, on March 1997, was followed by a political terror, prosecution and execution of the people, member[s] and activists of the Albanian Democratic Party, in opposition. The terror increased especially after the elections held on 29 June 1997, when the ex-communists came back in power through non-democratic means. Since that period of time the terror and violence became of a state policy nature. The so-called free and democratic election on October 2000, forced many political oppositionists [to] leave Albania.

Mr. Erind SIMO, born on 13 August 1983, left the country because of the frequent pressure[] exercised on him. The reasons[] that made Mr. Erind leave the country were: the active participation in the political life of the country. Because of his engagement in the Youth Union of the Democratic Party and his active participation in the local elections, in which he was a member of the Election Commission, Mr. Erind became a target of prosecution by the political forces, who did not desire his activity. Later on, he was registered, by the communist services, as a regular participant in the meetings organized by the opposition, against the injustices of the state.

He has also been one of the main militants[] who protested against the killing of the deputy Azem Hajdari. Mr. Erind SIMO was under continuous threat[]s, so he could not live in Albania any longer. On May 25, 2001 he left Albania for [the] U.S.A., because it was impossible for him to find a job or attend the university studies in his country.

The continuous disturbance by SHISH (Information Service) and the impossibility [of finding] a job made him make this decision.

The case of Erind is not the only one, concerning the continuous leaving of the young people from Albania. Looking for a better life, they were obliged to [leave] [their] hometown, their families and relatives.

-5-

The IJ determined that Simo's account was not credible, primarily on the basis of the fact that his responses at his interview on entering the country indicated nothing in the way of political persecution, and his failure to mention any such persecution cast doubt on his account at his later hearing. Also vital to the IJ's determination was the inconsistency between Simo's statement during his interview that he had purchased the passport himself and his later statement that he fled Albania at his father's urging and that his father bought the passport for him. The IJ also noted that during his interview, Simo had been asked if he had ever been arrested anywhere in the world for any reason, and Simo replied that he had not, a response that the IJ thought at odds with his account that he had been detained after being released from the hospital in March 2001.[3]

Simo appealed the IJ's decision to the Board of Immigration Appeals. The Board affirmed, stating that "insofar as [the Immigration Judge's adverse credibility] determination is based on inconsistencies between the respondent's testimony and his statements to an immigration official upon his arrival in the United States, we adopt and affirm the Immigration Judge's decision." It went on to explain that "[t]he inconsistencies

_____

[3]The IJ based its credibility determination on other factors as well, but the IJ's reasoning with respect to those factors was not adopted by the Board and so those factors are not pertinent to our review.

(which pertain to the respondent's motivation to flee from Albania and the mistreatment he allegedly suffered in that country) are material to the respondents' persecution and torture claims, have not been satisfactorily explained, and constitute a cogent basis for the adverse credibility determination." Simo now petitions for review of the Board's affirmance.

While we normally review a decision of the Board, not of an IJ, to the extent that the Board has adopted the decision of an IJ, we review the adopted portion of the opinion of the IJ as if it were part of the opinion of the Board. See Sulaiman v. Gonzales, 429 F.3d 347, 350 (1st Cir. 2005) (citing Njenga v. Ashcroft, 386 F.3d 335, 338 (1st Cir. 2004)). When asked to review a credibility determination by the Board, we look to see whether the determination is "supported by reasonable, substantial, and probative evidence on the record considered as a whole." Bocova v. Gonzales, 412 F.3d 257, 262 (1st Cir. 2005) (quoting INS v. Elias-Zacarias, 502 U.S. 478, 481 (1992)). We will not reverse a determination that a witness was not credible unless "any reasonable adjudicator would be compelled to conclude to the contrary" of the Board's determination. 8 U.S.C. § 1252(b)(4)(B); see also Chen v. Gonzales, 418 F.3d 110, 113 (1st Cir. 2005). Although a petitioner has the burden of establishing his eligibility for asylum, Settenda v. Ashcroft, 377 F.3d 89, 93 (1st Cir. 2004), withholding of removal, id., and relief under the CAT,

-7-

id. at 94, the Board may not reject a petitioner's testimony as incredible without a specific, cogent, and supportable explanation of what led it to its conclusion. See id. at 93 (quoting Gailius v. INS, 147 F.3d 34, 47 (1st Cir. 1998)). Here, read as it must be in light of the record as a whole, we find the Board's statement of its reasons for its adverse credibility determination sufficiently supportable.

At his initial interview at the airport, Simo gave not a hint that he had come to the United States out of fear that he would suffer politically motivated persecution in Albania, and he candidly admitted purchasing a falsified passport, giving an account that credibly suggested that he had purchased the passport himself. The picture the interview statements taken alone painted was of a young man who had decided in the ordinary course to try to smuggle his way into the United States, but who was caught in the process. Simo's later invocation of a tale of political persecution evidently sounded to the Board like a post hoc attempt at justification and a fabrication. Simo's description of the process by which he had himself purchased the falsified passport was inconsistent with his hearing testimony that his father had procured the passport for him. His statement that he had come to the United States because he "wanted to leave Albania," failing to mention any persecution he had experienced in that country, was not entirely inconsistent with his later testimony that he had

experienced such persecution, but was also consistent with any number of alternative stories -- among them, the government's theory at the hearing that Simo fled Albania in order to avoid that country's military service requirement -- and was suggestive that such an alternate explanation was at least as plausible as Simo's later account of persecution.[4]

Taken together, the inconsistent account of Simo's own procural of the falsified passport and his failure to mention persecution at the airport were sufficient to raise significant doubt about Simo's credibility. Simo was asked for an explanation at the hearing. Several answers might plausibly have explained the discrepancy, and had Simo presented a more compelling explanation, this case would look different -- as it would if Simo's case and corroborating evidence were stronger. Inconsistency between a petitioner's testimony before an IJ and earlier statements is not necessarily sufficient to justify an adverse credibility determination, but must be evaluated in light of the explanation for the inconsistency tendered by the petitioner and of the rest of the evidence presented. See Cordero-Trejo v. INS, 40 F.3d 482 (1st

---

[4]In his interview, Simo also denied ever having been arrested, and the IJ thought this statement was inconsistent with his testimony that he had been detained and threatened by Albanian police. These purportedly conflicting responses are not necessarily inconsistent, however, for it is not at all clear that Simo should have understood this alleged illegitimate detention to have been an "arrest" in the sense that the immigration officer intended.

Cir. 1994) (supposed inconsistencies in petitioner's testimony and evidence could not be basis for adverse credibility determination where IJ overlooked material in record that fully resolved those inconsistencies).

At the hearing, Simo only attested, first, and in contravention of the notes taken at the airport interview, that he had never said that he had procured the falsified passport himself, and second, that he had not slept for two days before the interview. Our cases make frequent reference to the failure of a petitioner to sufficiently explain inconsistencies. See, e.g., Chen, 418 F.3d at 3; Dhima v. Gonzales, 416 F.3d 92, 96 (1st Cir. 2005). The Board is bound to thoroughly consider a petitioner's explanation of inconsistencies if one is tendered. Here, it did consider Simo's tendered explanation but ultimately discredited it, and we see no grounds to say that it was compelled to do otherwise. Simo's corroborating evidence was unconvincing, and indeed some of it, like the newspaper article that recounted events similar to those recounted by Simo himself, seemed to suggest not the truth of Simo's story but its very fabrication. With no countervailing corroborating evidence suggesting a reason for the inconsistency that resolved it in favor of Simo's veracity at the hearing, the Board validly concluded on the basis of the inconsistency that Simo's story was not credible, because the contrary conclusion was not compelled by the evidence presented.

Without Simo's own testimony weighing in his favor, and with his own account given at the airport cutting against him, there was nothing erroneous in the Board's corollary determination that there was insufficient evidence presented to establish that Simo had the requisite well-founded fear of persecution. See Huang v. Gonzales, 438 F.3d 65, 66 (1st Cir. 2006) (citing Mihaylov v. Ashcroft, 379 F.3d 15, 21 (1st Cir. 2004); 8 C.F.R. § 208.13(b)). It follows inexorably that Simo did not carry his burden of demonstrating the likelihood of persecution requisite to a grant of withholding of removal, because such a grant requires a showing stronger than the showing requisite to a grant of asylum. Rodriguez-Ramirez v. Ashcroft, 398 F.3d 120, 123 (1st Cir. 2005). And it is likewise the case that, with Simo's hearing testimony discredited and in light of the inferences drawn against him on the basis of his interview responses, the Board did not demonstrably err in concluding that he did not merit relief under the CAT, which requires a demonstration that it is more likely than not that a petitioner will be tortured upon removal, see Romilus v. Ashcroft, 385 F.3d 1, 8 (1st Cir. 2004) (citing Elien v. Ashcroft, 364 F.3d 392, 398 (1st Cir. 2004); 8 C.F.R. §§ 208.16(c)(2), 208.17(a)).

For the foregoing reasons, we **affirm** the order of the Board of Immigration Appeals. The petition for review is **denied**.