**Not for Publication in West's Federal Reporter**
**Citation Limited Pursuant to 1st Cir. Loc. R. 32.3**

# United States Court of Appeals
## For the First Circuit

No. 05-2227

JANE JEPKOECH SOME,
Petitioner,

v.

ALBERTO R. GONZALES, Attorney General
of the United States; MICHAEL CHERTOFF, Secretary of the
United States Department of Homeland Security,
Respondents.

PETITION FOR REVIEW OF AN ORDER

OF THE BOARD OF IMMIGRATION APPEALS

Before
Selya, <u>Circuit Judge</u>,
Hug,[*] <u>Senior Circuit Judge</u>,
and Howard, <u>Circuit Judge</u>.

<u>Duane M. Hamilton</u> on brief for petitioner.
<u>Scott A. Hershovitz</u>, Attorney, United States Department of
Justice, and <u>Peter D. Keisler</u>, Assistant Attorney General, on brief
for respondent.

May 15, 2006

[*]Of the Ninth Circuit, sitting by designation.

**Per Curiam**.  Jane Jepkoech Some ("Some") petitions for review of a Board of Immigration Appeals ("BIA") decision finding that Some is not eligible for asylum and denying Some withholding of removal.  We deny the petition.

### Factual and Procedural Background

Some is a native and citizen of Kenya who last was admitted to the United States on January 17, 2002.  She was not authorized to stay in the United States beyond July 16, 2002.  In January 2003, Some applied for asylum.  In March 2003, the Immigration and Naturalization Service ("INS") issued Some a Notice to Appear, charging her with being removable under 8 U.S.C. § 1227(a)(1)(B) on the ground that she had remained in the United States for longer than the time permitted.  Some conceded removability in April 2003 and requested asylum, withholding of removal, and protection under the Convention Against Torture.

In October 2003, an immigration judge ("IJ") held a removal hearing.  At that hearing, Some testified that, since 1995, she had been a member of the Eagles Group, a social group of about twenty women who helped each other financially.  Some and most of the other Eagles Group members lived in Nairobi.  Some testified that the Eagles Group provided money, clothes, food, and supplies to a school that was being built with the help of the Seventh Day Adventist Church and local chiefs.  She also testified that, in

-2-

January 2000, she and a number of other Eagles Group members visited a village with the area's Masai chief to bring some girls from the village to the school. The Eagles Group thought that taking the girls to the school would prevent the girls from being subjected to female genital mutilation and young marriages.

Some also testified that, after Masai villagers took the girls from the school, she and other Eagles Group members went back to the village and brought the girls back to the school. She claimed that, around that time, she and almost all the other Eagles Group members started receiving threatening letters. Most of those Eagles Group members still live in Nairobi, and the school's enrollment has increased. Some does not claim that any of the Eagles Group members have been hurt.

According to Some's testimony, she continued to receive letters threatening to kill her and her family, to rape her, and to perform female genital mutilation on her. In fact, she testified that threatening letters still were being delivered to her Nairobi home at the time of her hearing before the IJ. Some did not place any of these letters into the record or save them.

Some also testified that, in May 2000, members of the Masai tribe jumped over the gate of her home and cut at the grates of her house. She told a friend that they killed her dog when he tried to bite them. Some escaped through her back door. After she called her husband, he told her to come home and she returned there

-3-

safely.

In addition, Some testified that, in January 2001, she and others took gifts to the school. When they were returning from delivering the gifts and were twenty miles from the school, some people from the Masai and Mungiki tribes threw stones at one of their cars, damaging the windshield.

The following month, Some briefly traveled to Uganda, but returned to Kenya. In March 2001, Some traveled to the United States, where her children were students and returned to her home in Nairobi in August 2001. According to Some, in October 2001, she again brought gifts to the school and people subsequently came to her home again and left threatening notes.

Some also testified that, in December 2001, she visited family in Turbo, which is about 400 kilometers from Nairobi. According to her testimony, on about December 15, members of the Mungiki and Masai tribes came with spears and daggers and threatened her and tried to break into the home where she was staying. However, these tribe members fled in their car when they saw other people coming in response to the cries of Some and her family. Some and her family remained in Turbo to celebrate Christmas.

In January 2002, Some traveled to the United States and visited her children who were attending school there. She had a return ticket and testified that her husband expected her to return

to Kenya, but that she did not intend to return because she believed her life was in danger and she would be raped and circumcised.

After conducting the hearing and receiving evidence, the IJ issued an oral decision denying Some's application for asylum, withholding of removal, and protection under the Convention Against Torture. In the course of providing her decision, the IJ noted a number of peculiarities and implausibilities and found that Some's testimony that her involvement in the school led to threats made "very little sense." The IJ also stated that she did

> not believe the respondent's testimony that she went to her uncle's home in Turbo and very shortly after arriving there, 15 Masai warriors and Mogiki cult members showed up, threatening to kill her. This incident bears no contemporaneous relationship to any activity of this respondent with respect to this girl's school.

The IJ concluded that Some's claims that people not of her tribe threatened to kidnap, rape, genitally mutilate, and kill her was "a phenomenal gross exaggeration" of any threat Some ever might have received. The IJ ultimately found that "the respondent's claim that she had left Kenya because of subjective fears, given that she traveled in and out of Kenya after coming here on two prior occasions, lacks credibility." The IJ further concluded that, even if Some had subjective fears, those fears were not well founded and she therefore failed to establish eligibility for

asylum.

Some appealed the IJ's decision to the BIA. The Government did not file a brief in opposition to the appeal.[1] In a written order issued on July 13, 2005, the BIA affirmed the IJ's decision and dismissed the appeal. The BIA first stated that "although the Immigration Judge did not make an explicit adverse credibility finding . . . it is clear that she found the respondent not credible given that she viewed the respondent's threat as a 'phenomenal gross exaggeration' and concluded that her testimony 'made little sense.'" The BIA also noted that the IJ concluded "that the respondent's motivation for leaving Kenya 'lack[ed] credibility' given that she traveled back to Kenya – while believing that her life was in danger there – on two prior occasions after visiting the United States."

The BIA then held that there was no clear error in the IJ's adverse credibility finding. In reaching this conclusion, the BIA reasoned that Some had "not shown how her involvement with the pro-women's Eagles Group and the Seventh-Day Adventist School would cause her to become a target for violence given that no other Eagles Group member has apparently been harmed and that the school

---

[1]Some claims that the Attorney General's failure to file a brief with the BIA bars him from filing a responding brief before this court. There is no basis in law for this argument. If the Attorney General were to raise new issues before this court, that would be another matter, but that is not the case here.

was endorsed by a Masai village chief and other local residents." The BIA also explained that the school's enrollment continues to expand and that most of the school officials and Eagles Group members still reside in Kenya. In addition, the BIA emphasized that, although Some claimed that she received over ten letters threatening her and that she continues to receive such letters, she did not produce any of them. The BIA then cited to the IJ's decision and concluded that, as a result of "these and other implausibilities in the record," the IJ did not clearly err in her adverse credibility ruling.

The BIA went on to assess the case based on the assumption that Some _was_ credible. The BIA concluded that Some "failed to present any reliable evidence demonstrating either past persecution or an objectively reasonable well-founded fear of persecution on account of any of the five enumerated grounds in the Act." The BIA therefore concluded that Some had failed to meet her burden of proof for asylum and had failed to establish eligibility for withholding of removal or for relief under the Convention Against Torture.

### Jurisdiction and Standard of Review

We have jurisdiction pursuant to 8 U.S.C. § 1252(a). We must uphold the BIA's determination that a person is not eligible for asylum if that decision is supported by reasonable, substantial, and probative evidence in the record considered as a whole. INS v.

Elias-Zacarias, 502 U.S. 478, 481 (1992); Fesseha v. Ashcroft, 333 F.3d 13, 18 (1st Cir. 2003). This deferential standard requires the petitioner to show that no reasonable factfinder could fail to find the requisite fear of persecution. Fesseha, 333 F.3d at 18; see also 8 U.S.C. § 1252(b)(4)(B)(2000) ("The administrative findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary.").

We also review adverse credibility findings under the substantial evidence standard. Chen v. Gonzales, 418 F.3d 110, 113 (1st Cir. 2005). "If the adverse credibility decision is supported by substantial evidence – that is, if we cannot say a finding that the alien is credible is compelled – then the decision must be affirmed." Id. When an asylum applicant "produces testimony showing a pattern of specific threats giving rise to a well-founded fear of persecution, the IJ must, if she or she chooses to reject that testimony as lacking credibility, offer a 'specific, cogent reason for [the IJ's] disbelief.'" Gailius v. INS, 147 F.3d 34, 47 (1st Cir. 1998) (citation omitted).

## Discussion

The Attorney General may grant asylum to an alien who is otherwise inadmissible or deportable, but only if the alien is a "refugee." 8 U.S.C. § 1158(b)(1). A refugee is an alien "who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, [her home] country

-8-

because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A). The burden is on the alien to prove refugee status. Fesseha, 333 F.3d at 18; 8 C.F.R. § 208.13(a).

A rebuttable presumption arises that an alien who has been persecuted in the past has reason to fear similar persecution in the future. Matter of Chen, 20 I&N Dec. 16, 18 (BIA 1989). Persecution "requires more than occasional detention, and, indeed, more than occasional instances of physical abuse." Nelson v. INS, 232 F.3d 258, 265 (1st Cir. 2000). Thus, even assuming that the alleged assaults and property damage occurred and were based on an enumerated ground in connection with the Kenyan government, this conduct would not be sufficient to compel a conclusion that Some suffered past persecution.

There remain the alleged threats of rape, female genital mutilation, and death. Although death threats may be sufficient to find past persecution, those death threats must be credible. Un v. Gonzales, 415 F.3d 205, 210 (1st Cir. 2005) (remanding for a determination of whether threats rising to the level of persecution were made).

Some argues that credibility should not even be an issue on appeal because the IJ did not make an explicit adverse credibility finding. This argument has no merit. Although it must be clear

from the IJ's decision that the IJ did, in fact, find the alien not to be credible, an adverse credibility ruling "does not require the recitation of unique or particular words." de Leon-Barrios v. INS, 116 F.3d 391, 394 (9th Cir. 1997).

In the instant case, the IJ made it quite clear that she found parts of Some's testimony not to be credible. The IJ found, inter alia, that Some's description of the threats was a "phenomenal gross exaggeration." She also found that "the respondent's claim that she had left Kenya because of subjective fears, given that she traveled in and out of Kenya after coming here on two prior occasions, lacks credibility." Thus, it is clear that the IJ found that Some's testimony was not credible with regard to the alleged threats.

We hold that substantial evidence supports the adverse credibility finding. First, if Some genuinely received credible threats of rape, mutilation, and death, it seems unlikely that she would return to her home, where she was receiving the threats. Returning to the country of asserted persecution may undercut an alien's credibility concerning the alleged fear of persecution. See Albathani v. INS, 318 F.3d 365, 373 (1st Cir. 2003) (affirming an adverse credibility finding, in part because the alien twice returned to the country of persecution after trips abroad). After she allegedly began receiving threats, Some twice left and returned to Kenya and even returned to her home in Nairobi where she

-10-

received the threats.[2]

Second, although Some claimed that she continued to receive threatening letters even after applying for asylum and she must have known that the threats were critical to her chances of success in obtaining asylum, she did not produce even one of the threatening letters, relying instead on her own testimony and testimony from her family. Corroborating evidence of threats generally is not required to establish an asylum claim if the applicant's own testimony is credible. Gailius v. INS, 147 F.3d 34, 45 (1st Cir. 1998). This is because refugees rarely are in a position to offer direct corroboration of specific threats. Id. In a situation where corroborating evidence is available to the alien, however, the failure to produce that evidence may be used to support an adverse credibility finding. See Albathani, 318 F.3d at 373. Here, Some claimed that threatening letters still were being delivered to her home following her application for asylum, but she did not produce the letters themselves, choosing instead to have her daughter testify and have her husband simply send his own letter claiming that the threatening letters really did exist. Although the evidence presented may corroborate part of Some's

---

[2]Although Some takes issue with the IJ's factual findings regarding exactly which countries Some visited and when, it is indisputable that, after allegedly receiving the threats, Some twice left Kenya and then returned to Kenya and to her home there. On one of these trips, she visited the United States, did not request asylum, and then returned to Nairobi.

testimony, it is not the kind of corroboration one would expect.

Taking into account both Some's return to her home and her failure to produce the letters, we find that substantial evidence supports the IJ's adverse credibility finding. As a result, we also find that there is substantial evidence to support the finding that Some did not experience past persecution.

For similar reasons, we conclude that there is substantial evidence that, independent of alleged past persecution, Some did not have a well-founded fear of persecution.[3] In examining whether a person has a well-founded fear of future persecution, we determine whether a reasonable person in the asylum applicant's position would fear persecution on a statutorily protected ground. Khalil v. Ashcroft, 337 F.3d 50, 56 (1st Cir. 2003). Some visited the school and the Masai village only a handful of times. In addition, although most of the Eagles Group members received threats and still live in Kenya, there is no evidence that any of them have been harmed as a result of their involvement with the

---

[3]The standard for withholding of removal is higher than the standard for granting asylum, so a failure to meet the asylum standard of a well-founded fear of persecution necessarily means that the petitioner did not meet the withholding of removal standard of a clear probability of persecution. Aguilar-Solis v. INS, 168 F.3d 565, 569 n.3 (1st Cir. 1999). Similarly, Some has not met the Convention Against Torture's requirement that it is more likely than not that the petitioner will be tortured. See 8 C.F.R. § 208.16(c)(2). Thus, Some's failure to establish that she is eligible for asylum necessarily means that she is not entitled to withholding of removal.

school.   Thus, there is insufficient evidence to compel the conclusion that a reasonable person in Some's situation would fear persecution.

The petition for review is **<u>denied</u>**.