Justice Scalia,
with whom Justice Alito joins, concurring.
I agree with the Court that “the statute has an ambiguity,” ante, at 517, with respect to whether an alien who was coerced to assist in persecution is barred from obtaining asylum in the United States. I agree that the agency is entitled to answer that question. Ibid. See Chevron U S. A. Inc. v. Natural Resources Defense Council, Inc., 467 U. S. 837, 843 (1984). And I agree that a remand is in order, to give the agency an opportunity to clarify whether its affirmative answer was premised on an erroneous view that this Court’s decision in Fedorenko v. United States, 449 U. S. 490 (1981), compelled it. Ante, at 523.
I would not agree to remand if I did not think that the agency has the option of adhering to its decision. The majority appears to leave that question undecided, ante, at 518 (reserving whether “a particular agency interpretation is reasonable”); two Justices forthrightly disagree and would require the agency to recognize at least some sort of duress exception, post, at 534-535 (Stevens, J., concurring in part and dissenting in part).
But good reasons for the agency’s current practice exist— reasons adequate to satisfy the requirement that an agency act reasonably in choosing among various possible constructions of an ambiguous statute. The statute does not mandate the rule precluding the duress defense but does not foreclose it either; the agency is free to retain that rule so long as the choice to do so is soundly reasoned, not based on irrelevant or arbitrary factors (like the Fedorenko precedent).
*526 The primary contention to the contrary is, in short, that barring aliens who persecuted under duress would punish purely “nonculpable” conduct. That argument suffers from at least three unjustified leaps of logic.
First, it implicitly adopts a view of “culpability” that is neither the only view nor one necessarily applicable here. The culpability of one who harms another under coercion is, and has always been, a subject of intense debate, raising profound questions of moral philosophy and individual responsibility. (The so-called “Nuremberg defense” comes readily to mind.) At common law, duress was not an accepted defense to intentional killing, see 2 W. LaFave, Substantive Criminal Law § 9.7(b), pp. 74-75 (2d ed. 2003); and in modern times, some States do not allow it as a defense to lesser crimes, see id., at 81-82, and n. 50. Notably, there is no historical support for the duress defense when a soldier follows a military order he knows to be unlawful. Id., § 9.7(g), at 86; see also, e. g., Axtell’s Case, Kel. J. 13, 84 Eng. Rep. 1060 (K. B. 1660); Prosecutor v. Erdemović, [1997] 2 ICTY Jud. Rep. 1610,1635 (Int’l Crim. Trib. for Former Yugoslavia). It is therefore far from clear that precluding a duress defense here would, as petitioner alleges, “disregard principles of blame ... ‘universal and persistent’ in American law.” Brief for Petitioner 32 (quoting Morissette v. United States, 342 U. S. 246, 250 (1952)). All of this suggests that those who are coerced to commit wrong are at least sometimes “culpable” enough to be treated as criminals.
More importantly, this is not a criminal matter. This Court has long understood that an “order of deportation is not a punishment for crime.” Fong Yue Ting v. United States, 149 U. S. 698, 730 (1893). Asylum is a benefit accorded by grace, not by entitlement, and withholding that benefit from all who have intentionally harmed others— whether under coercion or not — is not unreasonable.
Second, petitioner assumes that the persecutor bar must have been intended merely to punish wrongdoing. But in *527 the context of immigration law, “culpability” as a relevant factor in determining admissibility is only one facet of a more general consideration: desirability. And there may well be reasons to think that those who persecuted others, even under duress, would be relatively undesirable as immigrants. If, for example, the asylum laws grant entry to those who suffered the persecution, might it not be imprudent to also grant entry to the coerced persecutor, who may end up living in the same community as one of his victims? The Nation has a legitimate interest in preventing the importation of ethnic strife from remote parts of the world, and the agency may resolve the statutory ambiguity in a way that safeguards that interest.
Finally, even if culpability is the only relevant factor, and even if a narrow, criminal-law based view of culpability is the authoritative one, a bright-line rule excluding all persecutors — whether acting under coercion or not — might still be the best way for the agency to effectuate the statutory scheme. See generally Cox & Posner, Second-Order Structure of Immigration Law, 59 Stan. L. Rev. 809 (2007). Immigration judges already face the overwhelming task of attempting to recreate, by a limited number of witnesses speaking through (often poor-quality) translation, events that took place years ago in foreign, usually impoverished countries. See Dia v. Ashcroft, 353 F. 3d 228, 261-262 (CA3 2003) (en banc) (Alito, J., concurring in part and dissenting in part). Adding on top of that the burden of adjudicating claims of duress and coercion, which are extremely difficult to corroborate and necessarily pose questions of degree that require intensely fact-bound line-drawing, would increase the already inherently high risk of error. And the cost of error (viz., allowing im-coerced persecutors to remain in the country permanently) might reasonably be viewed by the agency as significantly greater than the cost of overinclusion under a bright-line rule (viz., denial of asylum to some coerced persecutors — who might anyway be entitled to protec *528 tion under the Convention Against Torture, which includes no analogous persecutor bar).
It is worth noting that although the agency’s “objective effects” approach to the statute would seem to sweep beyond the duress scenario to encompass even an alien who had no idea that his actions would “objectively” assist in persecution, see Castañeda-Castillo v. Gonzales, 488 F. 3d 17, 20 (CA1 2007) (en banc), there is no reason why the agency cannot consider questions of knowledge separate and apart from questions of duress. Both can be said to relate to the mental state of the persecutor,* but they present different problems which can be grappled with separately. The agency need not provide an “all-embracing answer,” ibid., in the present case. It may evaluate problems one by one as they arise, and whatever it might decide about an unknowing persecutor is irrelevant to petitioner, who knew exactly what he was doing.
To be clear, I do not endorse any particular rule. It is to agency officials, not to the Members of this Court, that Congress has given discretion to choose among permissible interpretations of the statute. They deserve to be told clearly whether we are serious about allowing them to exercise that discretion, or are rather firing a warning shot across the bow.

The rationale for the duress defense, however, is conventionally “not that the defendant. . . somehow loses his mental capacity to commit the crime in question,” but rather that “even though he has done the act the crime requires and has the mental state which the crime requires, his conduct... is excused.” 2 W. LaFave, Substantive Criminal Law § 9.7(a), p. 73 (2d ed. 2003).